**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

HARTFORD CASUALTY INSURANCE )
COMPANY, )
                        )
           Plaintiff, )
                        )    Case No. 12-cv-9975
           v. )
                        )    Judge Robert M. Dow, Jr.
CONTEXTMEDIA, INC., )
                        )
           Defendant. )

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff's motion for partial summary judgment [21] and Defendant's cross-motion for summary judgment [29]. Plaintiff Hartford seeks a declaratory judgment from the Court determining that it has no duty to defend ContextMedia in a suit brought by Healthy Advice Networks LLC, a competitor of ContextMedia, in the Southern District of Ohio. ContextMedia's counterclaim seeks the opposite ruling, as well as damages resulting from Hartford's alleged breach of its duty to defend ContextMedia to date. For the reasons stated below, the Court grants Hartford's motion for partial summary judgment as to Count XII and denies Hartford's motion as to Counts I, VI, and VII as moot [21]. The Court denies ContextMedia's cross-motion for summary judgment [29].

# I.    Background[1]

ContextMedia transmits health information to patients in the waiting rooms of physicians' offices through a "digital media platform."  Pl. Resp. to Def's SOF ¶ 29 [35]. According to its website, ContextMedia provides "patient marketing," "deliver[ing] messages to millions where and when they want it."  Def's Resp. to Pl. SOF ¶ 29 [31].  The company does this by supplying literature directly to the offices of physician, and, mostly, by displaying programming on television screens that the company provides to physicians for their waiting rooms so that patients can view ContextMedia's programming while waiting to see the doctor. [31] at ¶ 31.  The programming is delivered via a secure internet connection to a computer that is mounted behind each television set.  [31] at ¶ 32.  ContextMedia's programming includes both educational content and advertising.  [31] at ¶ 30.  The company provides the service to physicians free-of-charge and derives its revenue from pharmaceutical, nutrition, fitness, and device manufacturing companies that advertise on ContextMedia's network.  [31] at ¶ 33. Pharmaceutical companies, in particular, purchase ads because marketers "view the point-of-care channel as a strategic and relevant place from which to message" since programming reaches patients minutes before they make decisions about pharmaceutical products with their doctors. [31] at ¶¶ 34-35.  In fact, more than 75% of all global pharmaceutical companies are counted

---

[1] The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements.  It is the function of the Court, with or without a motion to strike, to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement.  See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004).  In many of Plaintiff's responses to Defendant's L.R. 56.1 statements, Plaintiff "objects to" and  "moves to strike" statements of fact as hearsay, irrelevant, and/or conclusory. Because the Court enforces the directives of L.R. 56.1 as a matter of course, these objections are noted, but will not be addressed individually.  Objection or not, any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on the parties' summary judgment motions.

among ContextMedia's advertising clients. [31] at ¶ 36. Not surprisingly, various articles appear on ContextMedia's website, toting the advantages of point-of-care and place-based advertising. [31] at ¶¶ 37-41.

ContextMedia's insurer, Hartford Casualty Insurance Company ("Hartford"), issued a series of business liability policies to ContextMedia that insured against certain risks for the period beginning August 1, 2008 and ending August 1, 2013. [31] at ¶ 23. Among other things, ContextMedia's policy covered (1) "property damage" caused by an "occurrence" and (2) "personal and advertising injury," as defined by the policy and subject to exclusions. [31] at ¶ 26. By the policy's terms, "property damage" is both "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." *Id.* An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* And "personal and advertising injury" includes, among other things, "injury" "arising out of" "[o]ral, written, or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services." *Id.*

Relevant here, the policy excluded property damage to "personal property in the care, custody, or control of the insured." [31] at ¶ 26. The policy also excluded "personal and advertising injury" "[a]rising out of an offense committed by an insured whose business is advertising, broadcasting, publishing, or telecasting." *Id.* at ¶ 27. On September 28, 2009, ContextMedia's insurance broker asked Hartford if the "Business of Advertising, Broadcasting, Publishing, or Telecasting" exclusion could be deleted from the policy. [37] at ¶ 24. Hartford informed ContextMedia's broker that Hartford "cannot delete this exclusion off of the policy for this classification," but that if ContextMedia "needs this coverage," Hartford could "send a

request to [its] Alternative Market Placement team and see if coverage [could] be obtained that route." [37] at ¶ 25; [35-2] Exh. 2-B. The Declarations page on each of Hartford's policies identified ContextMedia as an "Advertising Agency," ([31] at ¶ 24), but, despite that label, ContextMedia maintains that it is not actually an advertising agency (or a company in the business of "advertising, broadcasting, publishing, or telecasting," for that matter). [31] at ¶¶ 27-28.

The policy imposed on ContextMedia a duty to notify Hartford "of an 'occurrence' or an offense which may result in a claim" "as soon as practicable." [31] at ¶ 26. It also obligated ContextMedia to "[i]mmediately send [Hartford] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" *Id.*

On January 20, 2011, ContextMedia received a letter from competitor Healthy Advice Networks LLC ("HAN"). [31] at ¶ 16. In the letter, HAN alleged that ContextMedia had "accessed, removed, damaged and taken possession of various media equipment and other materials licensed to [HAN]" from the offices of several physicians. *Id.* at ¶ 17. The letter also evinced HAN's belief that ContextMedia had "intentionally interfered with contractual relationships between [HAN] and each Physician Office" and "generated and sent misleading and deceptive termination letters purportedly from the Physician Offices to Healthy Advice." *Id.* According to the letter, HAN had "already suffered material damages" as a result of ContextMedia's alleged conduct and was "prepared to protect its rights to the fullest extent of the law, including civil and criminal penalties." *Id.*

According to ContextMedia's Chief Financial Officer James Demas, upon receipt of the letter, ContextMedia interviewed employees and internally investigated the accusations. Pl. Resp. to Def's SOF ¶ 5 [35]. None of HAN's property turned up in the investigation, Demas

says, and ContextMedia's legal counsel assured it that HAN's allegations of "interference" and those concerning "termination letters" were simply a "tactic by a fearful competitor." [35] at ¶¶ 6-8. Its investigation and discussions with counsel therefore convinced ContextMedia that HAN's allegations were unfounded. [35] at ¶ 8. In the words of Demas, "ContextMedia did not believe it had done anything wrong, did not believe it would face any liability for the allegations in the January 20, 2011 letter, and did not believe insurance coverage was at issue." [35] at ¶ 9. Therefore, on January 28, 2011, ContextMedia responded to HAN's letter, disavowing any wrongdoing, but did not notify Hartford of HAN's accusations at that time. [35] at ¶ 10. In the January 28 letter, ContextMedia's counsel informed HAN that it had returned to HAN "any equipment that ha[d] come into ContextMedia's possession" and of its legal position that ContextMedia had not interfered with HAN's contractual relationships because of ContextMedia's "broad privilege to solicit physicians to provide" its services and because HAN's physician contracts are "terminable at will." Def's Resp. to Pl.'s SOAF [37] ¶ 7; [15-3] at p. 1.

ContextMedia and HAN exchanged additional rounds of letters in the weeks that followed. Def's Resp. to Pl. SOF ¶ 20 [31]. On February 8, HAN responded to ContextMedia's January 28 letter by "reiterat[ing] its demand that ContextMedia return" all of HAN's property (noting that the property it had received via mail had been shipped from ContextMedia's office) and that it "cease and desist" from any illegal activities with regard to HAN's contractual relationships. [23-5] at p.2. HAN also reminded ContextMedia that, at least as early as January 20, ContextMedia had been "under a continuing legal duty to preserve all documents . . . that are relevant or potentially relevant to this matter or risk court-imposed sanctions, fines, or other penalties for spoliation of evidence." *Id.* HAN informed ContextMedia that it was "prepared to

prosecute ContextMedia's unlawful actions to the full extent of civil and criminal law," if ContextMedia did not meet HAN's demands by February 11. *Id.* ContextMedia answered HAN's letter, as demanded, on February 11, renewing its position that it had returned all of HAN's property that ContextMedia had removed from physician's offices (with the exception of a media player that FedEx lost after ContextMedia attempted to mail it to HAN) and holding firm to its position that HAN's contracts with physicians are "terminable at will" by a physician who prefers the services of a "competitior with a superior service." *Id.* at p. 7. Given that, the letter described HAN's demands as "baseless." *Id.* ContextMedia made clear that its letter was "for settlement purposes only," was not "an admission of any liability or facts," and did not "waive any right, remedy, or position ContextMedia may have." [37] ¶ 9.

In a subsequent letter, dated March 1, 2011, HAN demanded that ContextMedia pay it $9,825 – $1,425 for missing equipment that HAN accused ContextMedia of taking from physician's offices and $8,400 in attorney's fees – and threatened to "pursue legal action against ContextMedia" if ContextMedia did not pay (and cease the other activity about which HAN complained in its letters) by March 4. [31] at ¶ 21. HAN's letter made clear that, in its view, neither ContextMedia nor the physicians in whose offices HAN had installed its equipment had authority to remove HAN's property, and that HAN's contracts with its physicians were not terminable at will. *Id.* Instead, HAN wrote, each of its contracts included a termination provision, requiring "a minimum service period and a specified notice period before the contract [could] be terminated." *Id.* Therefore, HAN's position was that ContextMedia's removal of HAN's equipment and its hand in facilitating the physicans' simultaneous cancellation of the HAN contracts, without regard for the termination provisions, constituted unlawful interference with HAN's contractual relationships. *Id.* Additionally, HAN's March 1 letter accused

ContextMedia of misappropriating ContextMedia's trade secrets and intellectual property. Specifically, HAN alleged that ContextMedia had unlawfully accessed confidential and proprietary information on HAN's equipment before returning the property. *Id.* HAN made clear that unless it "receive[d] a proper explanation" for why ContextMedia had plugged in and accessed the proprietary content on HAN's equipment before returning it, HAN would have "no choice but to initiate action to maintain protection of its trade secrets and other intellectual property rights." *Id.* The letter noted that attorneys for HAN and ContextMedia had spoken by phone on February 25 and that HAN was dissatisfied with the representations made by ContextMedia's counsel during that call. *Id.*

On March 4, ContextMedia's lawyers responded with a letter that offered to reimburse HAN only for the media player lost by FedEx. *Id.* ContextMedia reiterated its position that it had returned all of the other equipment to HAN that ContextMedia had taken. *Id.* In addition, ContextMedia's letter proposed a procedure that the two companies follow in "situations in which a physician provides notice of his or her decision to switch from [HAN] to ContextMedia" or vice versa. *Id.* The proposed procedure would afford each company five days to remove its equipment from a physician's office from the date on which that physician decided to switch providers, at the end of which the new provider would be permitted to remove the competitor's equipment. *Id.* With respect to HAN's allegations of contractual interference, the letter merely stated that, although ContextMedia had not seen any of HAN's physician contracts, it would "continue to rely" on the representations by those physicians with respect to the contracts' termination provisions and the physicians' authority to authorize ContextMedia to remove HAN's property. *Id.* ContextMedia's position was that it was "entitled to rely on the physican's directions" until HAN provided ContextMedia with a copy of its contracts to prove otherwise.

*Id.*  HAN characterizes ContextMedia's letter as a "counteroffer[] to settle HAN's claims," but ContextMedia takes issue with that depiction.  [31] at ¶ 22.  Notably, ContextMedia's letter made no mention of HAN's allegations regarding trade secrets.

After ContextMedia sent its letter on March 4, it heard nothing from HAN for over seventeen months, when HAN sued ContextMedia in the Southern District of Ohio on August 10, 2012 and served ContextMedia ten days later.  Pl. Resp. to Def's SOF ¶ 12 [35]; [31] at ¶ 6.  HAN's second amended complaint ("SAC"), which it filed on October 24, 2012, represents that HAN "deliver[s] health-related educational material in print and digital format to medical facilities throughout the United States."  Pl. SOF Ex. A. ¶ 7 [23].  According to the SAC, HAN "broadcast[s]" its "educational offerings" via media equipment that it provides to the medical practices it services.  [23] at ¶¶  7-10.  Before doing so, HAN enters into contracts with the practices, which outline the parties' relationship and responsibilities.  *Id.* at ¶ 12.  These contracts, HAN says, prohibit cancellation within the first six months and then require 30-60 days' notice before either HAN or the medical practice may cancel the agreement.  *Id.* at ¶ 13.  At all times, the SAC says, HAN's equipment and the contents of its programming remain HAN's property, and neither the medical practice nor any other party at a practice's direction are permitted to remove HAN's property without HAN's written consent.  *Id.* at ¶¶ 12-13.  HAN's asserts that "[i]n general, when Practices agree to the placement in their office of health education television monitors from one provider, it is to the exclusion of other providers."  *Id.* at ¶ 20.

HAN's SAC represents that ContextMedia is a "direct competitor" of HAN in the "health-related educational materials market throughout the United States, particularly in content related to rheumatology, diabetes, and cardiology."  *Id.* at ¶ 18.  HAN alleges that, "to penetrate

the health-related educational materials market," ContextMedia "aggressively target[s] Practices under contract with HAN to switch their services" to ContextMedia. *Id.* at ¶ 23. According to HAN, ContextMedia has been doing this by employing an "illegal and prohibited strategy" of "making false and/or misleading statements to potential customers regarding those customers' existing contracts with HAN and HAN's goods and services." *Id.* at ¶ 24. For example, HAN believes that ContextMedia "has falsely informed HAN Practices that the Practices have no contract with HAN and thus can switch to [ContextMedia's] services immediately." *Id.* at ¶ 25. In addition, ContextMedia "has falsely informed numerous HAN Practices that [ContextMedia] is authorized to remove the HAN property at their respective locations and replace it with [ContextMedia's] product," HAN alleges. *Id.* at ¶ 27. Further, HAN says, ContextMedia has falsely represented to HAN's clients that ContextMedia's system is an "upgrade" from HAN's system, and implies that HAN has given permission to ContextMedia to remove HAN's property. *Id.* HAN alleges that ContextMedia has made false statements to HAN clients about the quality of HAN's product as well, allegedly peddling such falsities as "HAN's programming is advertising;" "HAN's content is simply a half hour PowerPoint slide;" and "HAN's services cover only general health information" (as opposed to specialty areas). *Id.* at ¶¶ 33-36.

Besides the unlawful removal of HAN's property from physicians' offices, HAN's SAC alleges that ContextMedia obtained trade secrets from the property itself. *Id.* at ¶ 40. Specifically, HAN complains that ContextMedia removed HAN property from the office of a Chicago doctor in December 2010 and, rather than immediately sending the equipment to HAN, ContextMedia powered up HAN's CPU and recorded several years-worth of HAN's proprietary programming. *Id.* at ¶¶ 40-46. HAN alleges that ContextMedia has since used this information to ContextMedia's competitive advantage. *Id.* at ¶ 44. According to HAN, ContextMedia only

sometimes returns HAN's removed-property, and, even then, the property sometimes arrives in "damaged condition or missing various component pieces." *Id.* at ¶ 47.

Premised on its allegations of ContextMedia's false statements to HAN customers concerning HAN's products and its contracts, Counts I, II, and II allege unfair competition in violation of the Lanham Act, violations of Ohio's Deceptive Trade Practices Act, and tortious interference with HAN's contractual relationships. *Id.* at ¶¶ 60-64; 69-72; 78, 80. Based on its claims that ContextMedia has removed HAN's property, taken possession of it for "unknown period[s] of time before shipping it back to HAN," misappropriated trade secrets from the property, and the fact that in some instances "HAN never received the HAN property that was removed," Counts IV and V assert claims for conversion and a violation of Ohio's Uniform Trade Secrets Act, respectively. *Id.* at ¶¶ 84-87; 96-98.

HAN served ContextMedia with the suit on August 20, 2012, ([31] at ¶ 6), and ContextMedia notified Hartford of it on September 11, 2012. [35] at ¶ 30. Hartford assigned Barbara Gaglione as claim consultant for ContextMedia's claim. [35-1] at ¶ 2. According to Gaglione, she sent ContextMedia a letter two days later, announcing Hartford's review of the claim, and reserving Hartford's right to deny coverage. [37] at ¶ 16. ContextMedia "does not recall receiving any such letter." *Id.* Gaglione avers that she left a voicemail for James Demas at ContextMedia on October 12, 2012, informing Demas that Hartford "would be providing ContextMedia a defense under a reservation of rights to deny coverage." [37] at ¶ 17. Demas does not recall receiving this message either. *Id.* From the parties' fact statements, it appears that Gaglione attempted to send Demas a follow-up e-mail later on October 12, but ContextMedia insists that she sent it to the wrong e-mail address. [37] at ¶ 19. Regardless, Demas does recollect an October 23, 2012, phone conversation with Gaglione, in which she

informed him that Hartford would defend ContextMedia "under a reservation of rights."  *Id.*  On November 2, 2012, Gaglione informed Demas that Hartford was continuing to review coverage for the HAN suit.  [37] at ¶ 20.  On December 10, 2012, ContextMedia informed Hartford that, although it was still in the process of reviewing coverage, Hartford believed coverage of the suit was unlikely.  [37] at ¶ 21.  And on December 14, 2012, Hartford denied coverage for the HAN suit.  [37] at ¶ 22.  Hartford brought this suit, seeking a declaratory judgment, that same day. [37] at ¶ 23.

Hartford seeks a declaration that it has no duty to defend or indemnify ContextMedia on thirteen different grounds.  See [1].  Hartford's motion for partial summary judgment seeks a ruling on Counts I, VI, VII, and XII.  Count I asks the Court to conclude that the HAN suit does not assert claims for "damages" because of "property damage" caused by an "occurrence." Count VI seeks a ruling that HAN's allegations fall within the Care, Custody, or Control Exclusion.  Count VII argues that the Business of Advertising, Broadcast or Publishing Exclusion precludes coverage.  Count XII urges the Court to rule that ContextMedia breached its policy's notice requirement and, thus, is not entitled to indemnification or a defense from Hartford.  Hartford also seeks summary judgment on ContextMedia's two-count counterclaim, in which ContextMedia asserts that Hartford has a duty to defend ContextMedia in the HAN suit and owes ContextMedia damages for breaching that duty thus far.  ContextMedia has filed a cross-motion for summary judgment, seeking a favorable ruling on both its counterclaims.

## II.  Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To avoid summary judgment, the opposing party must go beyond the pleadings and "set

forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

### III.    Analysis

Hartford is an Indiana company and its principal place of business is in Connecticut. Illinois is both ContextMedia's state of incorporation and principal place of business. Because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, the Court has jurisdiction over this negligence action pursuant to 28 U.S.C. § 1332(a). In diversity cases, the Court applies federal procedural law and state substantive law. See *e.g., Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010). This case involves an insurance policy issued in Illinois, and the parties agree that Illinois law applies.

"When construing the language of an insurance policy, a court is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy." *Country Mutual Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 342-43 (Ill. 2006). "An insurance policy must be construed as a whole, giving effect to every provision." *Id.* at 343. "If the words used in the policy are unambiguous, they are given their plain, ordinary, and popular meaning." *Id.* at 343. "Although insurance policies are construed liberally in favor of coverage, this rule of construction comes into play only when the policy language is ambiguous." *Id.*

**A.  Notice Provision**

Hartford first argues that ContextMedia breached the policy's notice provision and that, consequently, Hartford owes no duty to defend or indemnify ContextMedia. ContextMedia's policy obligated it to notify Hartford "of an 'occurrence' or an offense which may result in a claim" "as soon as practicable" and required ContextMedia to "[i]mmediately send [Hartford] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" [31] at ¶ 26. In Hartford's view, HAN's letters to ContextMedia, the first of which was sent in January 2011, triggered these duties, and so by waiting until HAN brought suit a year-and-a-half later in August 2012 to call those issues to Hartford's attention, ContextMedia failed to notify Hartford "as soon as practicable" and declined to "immediately" send Hartford copies of HAN's demands.

It is well-settled that insurance policy notice provisions "impose valid prerequisites to insurance coverage." *Livorsi Marine*, 856 N.E.2d at 343. "[A]n insured's breach of a policy's notice provision will defeat the right of the insured party to recover under the policy." *West Am. Ins. Co. v. Yorkville Nat'l Bank*, 939 N.E.2d 288, 301 (Ill. 2010) (internal citations and quotations omitted). ContextMedia does not dispute this. Instead, ContextMedia argues that it

did not breach the policy's notice provision because a year-and-a-half *was* "as soon as practicable." In Illinois, "[a] policy provision requiring notice 'as soon as practicable' means notice must be given 'within a reasonable time.' *Yorkville Nat'l Bank*, 939 N.E.2d at 293. "The term 'immediate,' in the context of insurance policy notice provisions, has been interpreted in a similar manner." *Id.* at 294. "Whether notice has been given within a reasonable time depends on the facts and circumstances of each case." *Id.* (quoting *Livorsi Marine*, 856 at 343). But where, as here, the material facts are undisputed, "the reasonableness of notice to an insurer by its insured is a question of law." *Montgomery Ward & Co. v. Home Ins. Co.*, 753 N.E.2d 999, 1004 (Ill. 2001).

In Illinois, courts consider five factors in determining whether an insured provided notice within a reasonable time: (1) the specific language of the policy's notice provision, (2) the insured's sophistication in commerce and insurance matters, (3) the insured's awareness of an event that may trigger insurance coverage, (4) the insured's diligence in ascertaining whether policy coverage is available, and (5) prejudice to the insurer. *Yorkville Nat'l Bank*, 939 N.E.2d at 293-94 (citing *Livorsi Marine*, 856 N.E.2d at 344). Courts have been clear that these factors "*may* be considered" and, though relevant, are not individually determinative. See *Yorkville Nat'l Bank*, 939 N.E.2d at 293; see also *Philadelphia Indem. Ins. Co. v. 1801 W. Irving Park, LLC*, 2012 WL 3482260, at *7 (N.D. Ill. 2012) (citing *Farmers Auto. Ins. Ass'n v. Burton*, 967 N.E.2d 329, 334 (Ill. App. Ct. 4th Dist. 2012)). ContextMedia argues that, in consideration of these factors, its delay in providing notice to Hartford was reasonable, in spite of the nineteen-month gap between its receipt of HAN's letter on January 20, 2011 and its notification to Hartford of HAN's allegations on September 11, 2012.

ContextMedia summarily dismisses the policy's language (the first *Livorsi Marine* factor) as irrelevant here, since its policy does not specify a "concrete time frame" in which to provide notice. Def. Opp. Br. at p.8. But the policy's mandate that the insured provide notice "as soon as practicable" surely cuts in Hartford's favor. "Unambiguous words in the policy are to be given their plain, ordinary, and popular meaning." *Yorkville*, 939 N.E.2d at 293. Merriam-Webster's dictionary defines "practicable" as "capable of being put into practice or of being done or accomplished." Merriam-Webster.com, http:www.meriam-webster.com/dictionary/practicable (last visited August 20, 2014). ContextMedia was capable of notifying Hartford of HAN's accusations the moment it received HAN's first letter in January 2011. The letter, authored by HAN's outside counsel, characterized ContextMedia's behavior as "quite obviously an extremely serious matter." The letter "demand[ed]" that ContextMedia "cease and desist" a variety of specific and enumerated activities. It specified that HAN already had suffered "material damages" and, even at that early juncture, was prepared to "protect its rights to the fullest extent of the law, including civil and criminal penalties." Nothing prevented ContextMedia from providing notice at that point. Its only excuse for not doing so was its belief that "it would [not] face any liability for the allegations . . . and did not believe insurance coverage was at issue." [35] at ¶ 9. But one of the three cases on which ContextMedia relies in arguing that its nineteen-month delay was reasonable makes clear that "the belief that one is not liable is not an excuse for failing to give notice." *West Bend Mut. Ins. Co. v. United Road Towing*, 2008 WL 4442628, at *4 (N.D. Ill. Sept. 29, 2008) (citing *Tribune Co. v. Allstate Ins. Co.*, 715 N.E.2d 263, 270 (Ill. App. Ct. 1st Dist. 1999). Moreover, in *West Bend*, the Court was explicit that "[w]hen the threat of lawsuits occurred . . . [the insured] could no longer reasonably believe that they were not any kind of target or that their conduct was not at issue."

2008 WL 4442628, at *4. In other words, when legal action was threatened, "it would have been clear to any reasonable attorney . . . that a lawsuit was to be anticipated and that it should notice its insurers." *Id.*

The Supreme Court of Illinois's decision in *Yorkville*, the lone case on which ContextMedia rests in dismissing the policy's language as irrelevant, is no help to ContextMedia here either. In *Yorkville*, an insured was sued for defamation and consulted its insurance agent to determine if the suit fell under its insurance coverage. *Yorkville*, 939 N.E.2d at 295. The agent advised that the Directors and Officers (D&O) policy at issue did not cover defamation suits, and so, naturally, the insured saw no need to notify its insurer. *Id.* Twenty-seven months later, the insured learned of the agent's error and promptly notified its insurer. *Id.* The court determined that "[a] reasonably prudent party in the position of the insured would not have continued to pursue coverage under the policy having been informed by its agent that the policy afforded no coverage." *Id.* In light of the facts, the court concluded that the policy's mandate that the insured provide notice "as soon as practicable" did not aid in its reasonableness analysis. *Id.* at 294. The insured's diligence in ascertaining whether coverage was available (the fourth *Livorsi* factor), coupled with the fact that the insurer actually had learned (from some other source) of the suit within months of its filing, convinced the court that, on the whole, the insured's 27-month delay was reasonable. *Id.* at 294-96. None of those same circumstances are present here. *Cf. Philadelphia Indemnity*, 2012 WL 3482260, at *7 (deeming a ten-month delay in notice to be unreasonable and finding *Yorkville* to be unpersuasive on account of the "mitigating circumstances" present in that case).

Here, ContextMedia's CFO James Demas avers that "ContextMedia did not believe it had done anything wrong, did not believe it would face liability for the allegations in the January

20, 2011, and did not believe insurance coverage was at issue." [31-1] at ¶ 6. But ContextMedia consulted a lawyer, not an insurance agent as in *Yorkville*, and Demas' testimony suggests that ContextMedia believed that coverage was not at issue because it did not believe it would face liability, not because it believed that allegations of the sort contained in HAN's letters did not fall within its coverage. ContextMedia considered HAN's allegations "baseless" and its letters the tactics of a fearful competitor. And so because ContextMedia felt that it had the winning legal argument, it seems that it saw no need to notify Hartford of HAN's claims. But the policy's notice provision did not require it to notify Hartford only of claims that it believed to be meritorious, nor does ContextMedia make that argument. And how could it, given that (1) the policy imposes on Hartford the duty (and affords it the right) to defend its insured, regardless of a suit's or claim's ultimate merit, and (2) ContextMedia later notified Hartford of these same (supposedly) baseless allegations when HAN lodged them in a formal lawsuit?

In essence, by declining to provide notice of HAN's threats of legal action to Hartford, ContextMedia gambled in the hopes that HAN was bluffing and/or that ContextMedia's own letters had somehow persuaded HAN not to sue. But HAN ultimately did bring suit, just as its letters repeatedly warned that it would do if HAN's demands were not met. Yet ContextMedia wants Hartford to defend it in the face of its failed gamble. Unlike in *Yorkville*, though, where the insured sought and then reasonably relied on the assessment of its insurance agent, ContextMedia has no valid excuse for ignoring the policy's requirements that it notify Hartford "an 'occurrence' or an offense which may result in a claim" "as soon as practicable" and "[i]mmediately send [Hartford] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" "An insured may have good business reasons for not wanting to notice what it does not have to notice given the fact that too many notices,

particularly of large but dubious claims, might affect rates and availability of insurance from year to year – but this is not legal justification." *West Bend Mutual*, 2008 WL 4442628, at *3. Accordingly, both the first (the language of the policy provision) and fourth (the insured's diligence in ascertaining whether policy coverage is available) *Livorsi Marine* factor tip the balance in the direction of finding that ContextMedia's nineteen-month delay was unreasonable.

The second (the sophistication of commerce and insurance matters) and third (the insured's awareness of an event that may trigger insurance coverage) *Livorsi Marine* factors cut in Hartford's favor, as well. ContextMedia, which employed just twenty people in January 2011, contends that it was not sophisticated because it lacked risk management and legal departments. But ContextMedia is a successful company, not an individual policy holder with minimal business acumen, counting 75% of the world's pharmaceutical companies as its clients and which hired outside professionals for its insurance and legal needs. The evidence demonstrates that ContextMedia's insurance broker had familiarity with its insurance policy, (see [37] at ¶ 24-25), and that ContextMedia consulted with legal counsel from the Chicago office of McGuire Woods upon receipt of HAN's letters. To ContextMedia, the severity of HAN's accusations merited immediate consultation with an attorney from a large law firm. And, even though it may have considered HAN's allegations to be without merit, ContextMedia still felt that the risk of litigation was significant enough that it authorized its attorney to speak with HAN's representatives by phone and to send three separate letters to HAN in an effort to minimize that threat. Most indicative of ContextMedia's sophistication is the fact that it promptly notified Hartford when HAN eventually brought suit. That fact alone forecloses an argument that ContextMedia was too unsophisticated to understand that allegations of the type made in HAN's letters might be covered by its policy, because, in fact, when HAN carried out the very threat it

had made in writing nineteen months earlier (that it would sue ContextMedia unless it explained why it had accessed HAN's trade secrets, and ceased and desisted removing its property and interfering with its contractual relationships), ContextMedia immediately notified Hartford and demanded that Hartford defend it against these same allegations. ContextMedia may have believed that it ultimately would not face liability, but that belief was formed with the assistance of sophisticated legal counsel from McGuire Woods. Therefore, ContextMedia's attempt to claim unsophistication due to its lack of risk management and legal departments falls flat.

To the extent that ContextMedia argues that it "did not believe coverage was at issue" because it thought that the risk of a suit (and thus the likelihood that Hartford's duty to defend would be implicated) was minimal, that belief is objectively unreasonable. In three separate letters, HAN threatened to sue if ContextMedia did not meet its demands. On January 20, HAN "demand[ed]" that ContextMedia "cease and desist" the "unlawful activities" of interfering with its contractual relationships and accessing and removing its property. The letter made clear that ContextMedia's behavior had already caused "material damage[]" to HAN and that it would "no[t] hesitate" and "[was] prepared to protect its rights to the fullest extent of the law, including civil and criminal penalties." HAN reiterated its demands on February 8, again demanding that ContextMedia "cease and desist" its activities. Moreover, the letter explicitly notified ContextMedia of its "continuing legal duty to preserve all documents, no matter what form those documents are in, that are relevant or potentially relevant to this matter or risk court-imposed sanctions, fines, or other penalties for spoliation of evidence." Further, the letter threatened to sue if HAN "receive[d] *anything less*" than full compliance with its terms. But ContextMedia did not comply. Instead, it held firm to its position that the complained-of activities – namely, interfering with HAN's customer contracts and removing HAN's property without its approval –

were not illegal.  In the face of ContextMedia's repudiation, HAN's March 1 letter then outlined for ContextMedia the termination provisions found in its contracts, demonstrating that, if true, ContextMedia likely facilitated physicians' breaches of those agreements.  HAN also represented that its contracts did not authorize its physician customers to permit anyone but HAN to remove its property.

On top of that, HAN's March 1 letter identified a new, arguably more serious, basis for concern, accusing ContextMedia of stealing trade secrets and other proprietary and confidential information from HAN's equipment after removing it from physician offices.  HAN threatened to sue to protect its trade secrets and intellectual property if it did not receive a "proper explanation" for why ContextMedia had accessed its proprietary information, and threatened to "pursue legal action" if HAN's other demands were not met, by March 4.  Yet, in its March 4 response, ContextMedia entirely ignored HAN's intellectual property concerns.  And, despite admitting that it had not seen HAN's physician contracts, ContextMedia represented that it would continue to rely on the physicians' interpretations of those contracts unless and until HAN produced the contracts to ContextMedia and proved those interpretations false.  HAN's March 1 letter had characterized ContextMedia's contentions concerning its contracts as "simply incorrect," its defense as having "no basis in law and . . . quite frankly, absurd," and ContextMedia's misappropriation of HAN's trade secrets as an "intentional act[]."  Yet, in the face of HAN's ultimatum – the letter closed by declaring that HAN would "pursue legal action against ContextMedia for injunctive relief, damages, and all other relief allowable under law or equity, including possible criminal charges" unless its demands were met by March 4 – ContextMedia refused to accede to HAN's demands, essentially calling HAN's bluff.  At that point, ContextMedia reasonably should have been expected to be sued, if for no other reason,

than that HAN did reply to ContextMedia's March 4 letter. Therefore, to the extent that ContextMedia argues that it did not believe that coverage was at issue because it did not think that it would be sued, the Court rejects that argument. See *MHM Services, Inc. v. Assurance Co. of America*, 975 N.E.2d 1139, 1153 (Ill. App. 1st Dist. 2012) ("In some instances, an insured's belief that coverage was not available under a particular policy has been deemed an acceptable excuse where the insured was acting as a reasonably prudent person when it formed this belief."). In short, ContextMedia's level of sophistication (the second *Livorsi Marine* factor), coupled with its awareness of events that reasonably could trigger a claim (the third), also counsel in favor of deeming ContextMedia's nineteen-month delay in providing notice unreasonable.

ContextMedia tries to tag Hartford with failing to demonstrate that Hartford suffered prejudice (the fifth and final *Livorsi Marine* factor) as a result of ContextMedia's nineteen-month delay. But ContextMedia misstates the burden on this issue. "An insured who knows a suit against it exists but allows a considerable length of time to pass before notifying the insurer does not automatically lose coverage under the insurance policy, even one which includes the 'as soon as practicable' provision. This is true, however, only if the insured's delay in notifying the insurer is justifiable." *Northern Ins. Co. of New York v. City of Chicago*, 759 N.E.2d 144, 149 (Ill. App. 1st Dist. 2001). Therefore, the *insured* "must provide a justifiable excuse for its delay." *Id.* at 150; see also *Am. Mut. Liab. Ins. Co. v. Beatrice Companies, Inc.*, 924 F.Supp. 861, 875 (N.D. Ill. 1996) ("A lengthy passage of time is not an absolute bar to coverage provided the insured has a justifiable excuse for its delay.").

Moreover, the Court rejects the suggestion that ContextMedia makes throughout its briefing that prejudice is a prerequisite to a determination of a breach of a notice provision.

*Livorsi Marine* makes abundantly clear that that is not the law, affirmatively stating that prejudice is but "one potential factor in the reasonableness analysis." 856 N.E.2d at 344. In that case, the Supreme Court of Illinois clarified that "lack of prejudice may be a factor in determining the question of whether a reasonable notice was given in a particular case, but that lack of prejudice is not a condition which will dispense with the requirement of reasonable notice." *Id.* (internal citations and quotations omitted). Thus, the court held, "the presence or absence of prejudice to the insurer is one factor to consider when determining whether a policyholder has fulfilled any policy condition requiring reasonable notice." *Id.* But although prejudice is not vital to a determination of unreasonableness, Hartford *does* argue that it suffered prejudice. By failing to notify Hartford when HAN first lodged its accusations, ContextMedia deprived Hartford of the ability to investigate and resolve HAN's claims prior to suit. ContextMedia argues that this is not prejudice because Hartford "fails to explain what it would have done differently or how earlier notice would have affected its interests." [36] at p. 8. But Hartford could have done any number of things, including (as Hartford says) investigating the allegations early on and attempting to resolve HAN's claims prior to its suit. Hartford could have done this by addressing HAN's allegations of trade secret misappropriation (which ContextMedia ignored) or by actually obtaining HAN's physician contracts and reviewing their termination provisions and equipment-removal language, rather than, as ContextMedia did, simply taking each physician's word for it (physicians, who, the Court presumes are not lawyers and lack expertise in contract law). Common sense dictates that Hartford, knowing that it might have to defend ContextMedia in a potential lawsuit, likely would have responded to HAN's threats differently than the way in which ContextMedia reacted, which (outside of responding to HAN's letter, as the Court has outlined) made no effort at all to subdue HAN's threat of

litigation.  ContextMedia, acting under the assumption that Hartford would pay to defend it if sued, had a far different financial incentive than Hartford, its insurer, to placate HAN.  Illinois courts recognize that "[t]he primary purpose" of a notice requirement in an insurance policy "is to enable the insurer to make a timely and thorough investigation of a claim and to protect itself against unjustifiable claims."  *State Farm Mut. Ins. Co. v. Gray*, 570 N.E.2d 472, 474-75 (Ill. App. 1st Dist. 1991); see also *Bakal v. Paul Revere Life Ins. Co.*, 576 F.Supp.2d 889, 895 (N.D. Ill. 2008).  Here, ContextMedia deprived Hartford of the ability to act in its own interest prior to the litigation, instead ignoring HAN's demands, continuing its allegedly unlawful conduct, and racking up potential damages over the course of nineteen months.  The degree to which Hartford was prejudiced may be uncertain, but this factor, if it cuts in any direction, certainly weighs in favor of finding that ContextMedia's nineteen-month delay was unreasonable.

At the end of the day, ContextMedia wants to have its cake and eat it too.  It wants to be able to ignore threatened legal action, the defense of which it expects its insurer ultimately to pay, while waiting to see if a suit is brought before telling its insurer about it.  That way, if no suit comes to fruition, ContextMedia avoids involving its insurance company and the potential premium increases that could result.  If, instead, the threat is realized, ContextMedia can simply beckon its insurer to defend it regardless of how much time has passed since the potential claim arose.  But this wait-and-see approach is precisely what the notice provision prohibits. ContextMedia's policy required it to notify Hartford "of an 'occurrence' or an offense which may result in a claim" "as soon as practicable" and to "[i]mmediately send [Hartford] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'"  ContextMedia's reading of the notice provision, in effect, rewrites the policy so that it only has to give notice when sued.  The Court rejects ContextMedia's attempt to do so, because

"[w]hen construing the language of an insurance policy, a court is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy." *Livorsi Marine*, 856 N.E.2d at 342-43.

Here, nineteen months passed between the threat of legal action and the legal action itself. If this is "as soon as practicable," then, as ContextMedia would have it, under these facts there really was no amount of time that could have passed that would have rendered its delay unreasonable. Taking ContextMedia's position to its logical extreme, ContextMedia could have kept its eyes on the statute of limitations, hoping the clock would run out before being sued. If the clock did run, the suit would be time-barred, and ContextMedia would be armed with an affirmative defense, even if a court found that it had breached its policy's notice provision. And if a potential plaintiff brought suit just in the nick of time, hypothetically several years after first threatening to sue, then, by ContextMedia's logic, Hartford would still have to defend it. That runs counter to a plain reading of the policy and to Illinois case law on notice provisions.

The Court's reasonableness determination is bolstered by Illinois courts that have deemed delays shorter than nineteen months to be unreasonable (*i.e.*, not "as soon as practicable"). The Illinois Appellate Court, for example, determined that a 17-month delay was unreasonable, noting that "an insured's belief of non-coverage under a policy" cannot be an acceptable excuse if the insured did not act as a reasonably prudent person would in determining if the occurrence of lawsuit was covered by the policy. *Northbrook Property & Cas. Ins. Co. v. Applied Systems, Inc.*, 729 N.E.2d 915, 923 (Ill. App. 1st Dist. 2000). The Seventh Circuit (albeit in the context of screening prisoner complaints pursuant to 28 U.S.C. § 1915A(a)) has said that "[t]en months exceeds *any* understanding of 'as soon as practicable.'" *Wheeler v. Wexford Health Services, Inc.*, 689 F.3d 680, 681 (7th Cir. 2012) (emphasis added). Relying both on that statement and

the *Livorsi Marine* factors, Judge Tharp in *Philadelphia Indemnity* concluded that an insured's delay of just over ten months in notifying its insurer of a lawsuit constituted a breached of its policy's notice provision. *Philadelphia Indem.*, 2012 WL 3482260, at *7.

The Supreme Court of Illinois counsels that the facts and circumstances of an individual case drive the reasonableness analysis, (*Livorsi Marine*, 856 N.E.2d at 343), and ContextMedia is unable to direct the Court to any case[2] (and the Court has not found one) where an insured was threatened with a lawsuit, ignored that threat for over a year-and-a-half in defiance of its policy's notice provision, and a court deemed the insured to have provided notice "as soon as practicable." In light of the facts and circumstances here and the relevant Illinois case law, the Court determines that ContextMedia did not notify Hartford of HAN's allegations "as soon as practicable," and thus breached its policy's notice provision. Therefore, because compliance with this provision was a "valid prerequisite[] to insurance coverage," the Court concludes that Hartford has no duty to defend or indemnify ContextMedia in HAN's suit in the Southern District of Ohio.[3] *Livorsi Marine*, 856 N.E.2d at 343. Accordingly, Hartford is entitled to summary judgment on Count XII.

---

[2] ContextMedia does cite to a case in which the court deemed reasonable an insured's 33-month delay in notifying its insurer that it had been sued based on the insured's reliance on its attorney's representation that the case was one of "non-liability." *Pacific Employers v. Clean Harbors*, 2011 WL 813905, at *6 (N.D. Ill. Feb. 24, 2011). But unlike here, that case involved an excess carrier, and, until summary judgment revealed that damages may implicate the excess policy, the insured reasonably relied on its attorney's assessment that the limits of the underlying coverage would satisfy the damages that reasonably could have been expected to be recovered. *Id.* Importantly, the insured promptly notified the underlying insurer of the suit. *Id.* at *1-2. Unlike defendant Clean Harbors, ContextMedia did not promptly notify its primary insurer (Hartford), and no excess coverage is at issue here. ContextMedia's attorney's assessment of the merits of HAN's claims was irrelevant to whether it had to provide notice, because the policy afforded Hartford the right to be notified of a claim or suit (and obligated Hartford to defend it), irrespective of the legitimacy of the allegations. And, as discussed in detail, if ContextMedia did not notify Hartford because it believed that HAN would not sue it, that belief was objectively unreasonable. For these reasons, *Pacific Employers* is distinguishable and unpersuasive.

[3] Citing *Maryland Cas. Co. v. Peppers*, 355 N.E.2d 24, 28 (Ill. 1976), ContextMedia argues that Hartford must defend it, *even if* its unreasonably delayed in notifying Hartford of HAN's claims, since HAN's

## B. Counts I, VI, and VII

Because Hartford has no duty to defend ContextMedia, the Court need not reach the issues raised by Counts I (whether the HAN suit asserts claims for "damages" because of "property damage" caused by an "occurrence"), Count VI (whether HAN's allegations fall within the Care, Custody, or Control Exclusion), or Count VI (whether the Business of Advertising, Broadcast or Publishing Exclusion precludes coverage). Therefore, Hartford's motion for summary judgment is denied as moot as to Counts I, VI, and VII.

## C. ContextMedia's Cross-Motion for Summary Judgment

ContextMedia argues that it is entitled to summary judgment on its counterclaims – that Hartford breached its duty to defend ContextMedia and must pay damages for doing so – *even if* the Court concludes (as it has) that ContextMedia breached the policy's notice provision. In ContextMedia's view, even if the Court determines that Hartford has no duty to defend ContextMedia, that decision only has effect going forward, and so Hartford must still pay damages for its failure to defend ContextMedia to this point. An insurer's duty to defend is triggered if at least some of the allegations in the complaint "fall within, or potentially within, the policy's coverage." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). According to ContextMedia, Hartford "unconditionally and without reservation of rights" agreed to defend it upon notification of the HAN suit, and by doing so, "demonstrate[ed] that it

---

letters did not allege (as HAN's SAC does, ContextMedia says) that ContextMedia "slandered, libeled, or disparaged HAN." But HAN is not suing ContextMedia for slander, libel, or disparagement, and to the extent that the SAC accuses ContextMedia of doing those things, HAN's letters made all of the same material accusations. Moreover, *Peppers* lends no support to ContextMedia's argument that Hartford would be required to defend ContextMedia if the SAC had included fresh allegations of wrongdoing. The citation to *Peppers* merely stands for the proposition that an insured's duty to defend extends to cases where the complaint alleges several causes of action or theories of recovery against an insured and only one of them falls within the insured's coverage. Relevant here, and fatal to ContextMedia's unsupported argument, is *Livorsi Marine*'s unequivocal pronouncement that "once it is determined that the insurer did not receive reasonable notice of an occurrence or lawsuit, the policyholder may not recover under the policy, regardless of whether the lack of reasonable notice prejudiced the insurer." 856 N.E.2d at 346.

too believed a potential for coverage existed," and thus, acknowledged its duty. Def. Cross-MSJ [30] at p. 21. Having done that, ContextMedia contends, Hartford may not retroactively extinguish that duty through this litigation; it only may discontinue it. Even putting aside its somewhat circular nature, ContextMedia's logic suffers from several fatal flaws.

First, there is absolutely no evidence in the record that Hartford agreed to defend ContextMedia "unconditionally and without reservation of rights." Quite the contrary, the evidence before the Court demonstrates that Hartford's claim consultant Barbara Gaglione, throughout her dealings with ContextMedia, expressly reserved Hartford's right to deny coverage and/or made explicit that Hartford still was in the process of reviewing ContextMedia's claim. Although ContextMedia's CFO James Demas "does not recall" receiving Gaglione's September 13 letter or October 12, 2012 voicemail and e-mail to that effect, ([37] at ¶ 16), Demas admits that Gaglione informed him during an October 23, 2012 telephone call that Hartford would defend ContextMedia "under a reservation of rights." [37] at ¶ 16. He also concedes that Gaglione told him, on November 2, 2012, that Hartford was continuing to review coverage for the HAN suit, ([37] at ¶ 20), and that, on December 10, 2012, Hartford informed ContextMedia that it was still in the process of reviewing coverage, but that Hartford believed coverage of the suit was unlikely. [37] at ¶ 21. There is simply no evidence in the record that Hartford, at any time, "unconditionally" or "without a reservation of rights" agreed to defend ContextMedia in the HAN suit. In every communication that Hartford had with ContextMedia from the time ContextMedia notified Hartford of the HAN suit on September 11 and Hartford's denial of coverage on December 14, Hartford made clear that it had not yet made a coverage determination.

Second, ContextMedia cites no law in support of the proposition that, even if Hartford's representations somehow constituted an admission of uncertainty and therefore a "potential" for coverage, that Hartford must now pay damages to ContextMedia for money it spent defending itself to this point. In *General Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, the primary case on which ContextMedia relies, the Supreme Court of Illinois held that once an insurer reveals some uncertainty concerning coverage (in that case, by notifying the insured in its reservation of rights letter that "the claim *may not be* covered under the policy), the insurer may not seek reimbursement for defense costs that it incurred if a court later declares that the insurer has no obligation to defend it after all. 828 N.E.2d 1092, 1103 (Ill. 2005). For that reason, the court "refuse[d] to permit an insurer to recover defense costs pursuant to a reservation of rights absent an express provision to that effect in the insurance contract between the parties." *Id.* Here, Hartford does not seek reimbursement for the defense costs it incurred prior to its denial of coverage on December 14; ContextMedia seeks reimbursement for costs it has incurred from the time Hartford denied coverage until such time that a court substantiates that decision (as this Court does today). But ContextMedia's reading of *General Agents* is a strained one, and one that subsequent Illinois cases have foreclosed.

In *Allstate Ins. Co. v. Amato*, 865 N.E.2d 516 (Ill. App. 1st Dist. 2007), for example, an insured made precisely ContextMedia's argument. Citing *General Agents*, the plaintiff contended that he was "entitled to reimbursement for the fees and costs he incurred in defending the underlying complaint during the period of time that coverage remained uncertain." *Id.* at 523. The Illinois Appellate Court rejected this argument, finding *General Agents* "inapposite" because "instead of agreeing to defend [the plaintiff] through a reservation of rights letter, [the insurer] opted to seek a declaratory judgment stating that" there was no coverage. *Id.* at 524.

The *Amato* court, therefore, declined to read *General Agents* as having created a right of reimbursement for an insured's defense costs that post-date an insurer's filing of an action seeking a declaratory judgment concerning coverage, if that insurer, in fact, prevails. And so since this Court has determined that Hartford does not have an obligation to defend to ContextMedia, ContextMedia may not seek reimbursement either.

Moreover, in *Those Certain Underwriters at Lloyd's v. Professional Underwriters*, another Illinois court made clear that an insurer that files a declaratory judgment "before or pending trial of the underlying action" "is under no obligation to act on its alleged duty to defend until after the declaratory judgment action." 848 N.E.2d 597, 604 (Ill. App. 2d Dist. 2006). "An insurer of course has the option of paying the costs of defense upfront under a reservations of rights," (which Hartford initially did here while it reviewed ContextMedia's coverage), "but it also has the option of filing a declaratory judgment action and waiting to act until after its policy obligations are determined, at which time the insurer may be liable to reimburse the insured for any costs of defense the insurer should have paid." *Id.* The court explicitly stated that *General Agents* had no effect on this "well-established" Illinois rule. *Id.* at 602-03. Accordingly, ContextMedia's pursuit of damages for defense costs it incurred from the time of Hartford's denial of coverage until today's ruling substantiating Hartford's decision has no basis in Illinois law.

For these reasons, the Court denies ContextMedia's cross-motion for summary judgment.

## IV. Conclusion

For the reasons stated, the Court grants Hartford's motion for partial summary judgment as to Count XII and denies Hartford's motion as to Counts I, VI, and VII as moot [21]. The Court denies ContextMedia's cross-motion for summary judgment [29].

Dated:  August 28, 2014

_____
Robert M. Dow, Jr.
United States District Judge